UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT PRESTON,

           Plaintiff,

    v.

ZAHED U. AHMED, et al.,

           Defendants.

Case No.  15-cv-04840-DMR (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**I.    BACKGROUND**

Plaintiff Robert Preston, a state prisoner currently incarcerated at the California Substance Abuse Treatment Facility, has filed a *pro se* civil rights complaint under 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his medical needs while he was housed at the Correctional Training Facility ("CTF"), where he was previously incarcerated from 2013 through 2015. Dkt. 6. Plaintiff alleges that he suffers from multiple ailments, including neck pain, lower back pain, arthritis, and "serious nerve entrapment - neuropathy."[1] *Id.* at 4-5.[2] Plaintiff claims that he did not receive treatment for the aforementioned conditions from the date he transferred from Mule Creek State Prison ("MCSP") to CTF on September 9, 2013 until the

---

[1] In conventional medical usage, the word "neuropathy" (neuro-, "nervous system" and -pathy, "disease of") usually means peripheral neuropathy. Peripheral neuropathy is damage to the nerves that send signals to and from the brain and spinal cord. *See* http://www.webmd.com/brain/peripheral-neuropathy-directory (last visited Sept. 18, 2017).

[2] Page number citations refer to those assigned by the court's electronic case management filing system and not those assigned by the parties.

date he signed the instant complaint on October 10, 2015. *Id.* He adds that his requests for a "lower bunk, extra mattress, extra pillow, back brace, and orthotics boots, plus the morphine 2x a day he was receiving [at MCSP]" were denied by Defendants. *Id.* at 6. Because Plaintiff was denied such "chronos"[3] and treatment, he claims that he suffered "excruciating pain all day and night." *Id.* at 8. Plaintiff named the following Defendants at CTF: Primary Care Physician ("PCP") Zahed U. Ahmed; Former Staff Physician J. Chudy; Former Chief Medical Officer ("CMO") and Chief Medical Executive ("CME") M. Sepulveda; Current CME A. Adams; and Current Chief Executive Officer ("CEO") C. Ellis. Plaintiff originally sought injunctive relief and monetary damages.

This action has been assigned to the undersigned magistrate judge. Pursuant to 28 U.S.C. § 636(c), with written consent of all parties, a magistrate judge may conduct all proceedings in a case, including entry of judgment. Appeal will be directly to the United States Court of Appeals for the Ninth Circuit. *See* 28 U.S.C. § 636(c)(3). All parties have consented to magistrate judge jurisdiction in this matter. Dkts. 5, 26, 80.

In an Order dated April 7, 2016, the court dismissed as moot Plaintiff's claims for injunctive relief based on his confinement at CTF because he had been transferred to another prison and had no reasonable expectation that he would be subjected to the prison conditions from which he sought injunctive relief. Dkt. 11 at 2 (citing *Dilley v. Gunn*, 64 F.3d 1365, 1368-69 (9th Cir. 1995)). The court also found that, liberally construed, the complaint stated cognizable Eighth Amendment claims against the named Defendants for deliberate indifference to Plaintiff's serious medical needs. *Id.* at 3. The court ordered service of the complaint on Defendants Ahmed, Bright, Chudy, Sepulveda, Ellis, and Adams. The court issued a briefing schedule for Defendants to file a motion for summary judgment or other dispositive motion.

Pursuant to that briefing schedule, and after being granted extensions of time to do so, Defendants filed the instant motion for summary judgment. Dkt. 47. At the time the motion was filed, Defendant Sepulveda had not yet been served. Defendant Sepulveda has since been served,

---

[3] A "chrono" is a form that allows prisoners to request certain medical accommodations as deemed necessary by medical staff.

1   and he has filed a Notice of Joinder, which will be construed as a motion to join the other

2   Defendants' motion for summary judgment. Dkt. 79. Defendant Sepulveda's motion is

3   GRANTED, and the joinder is accepted. *Id.*

4   Plaintiff has opposed Defendants' motion, and he has filed a cross-motion and declarations

5   in support of his cross-motion. Dkts. 58-63, 68.[4] Defendants filed their reply and an opposition to

6   Plaintiff's cross-motion. Dkt. 68. Defendants also filed oppositions to some of Plaintiff's exhibits

7   in support of his opposition and cross-motion. Dkt. 68 at 7-8. Plaintiff thereafter filed a reply to

8   Defendants' opposition. Dkt. 68.

9   Defendants' motion for summary judgment is based on the following grounds: (1) that

10  Plaintiff failed to exhaust administrative remedies under the Prison Litigation Reform Act of 1995

11  ("PLRA"), 42 U.S.C. § 1997e(a), as to his claims regarding specific medical claims asserted in the

12  complaint, and as to his claims about the adjudication of administrative grievances; (2) that the

13  undisputed material facts show that Defendants were not deliberately indifferent to Plaintiff's

14  serious medical needs; and (3) that Defendants are entitled to qualified immunity. Dkt. 47 at 6. In

15  addition, in opposing Plaintiff's cross-motion for summary judgment, Defendants contend that an

16  exhibit presented by Plaintiff "clearly shows that this federal action and [Plaintiff's] cross-motion

17  for summary judgment are both barred by the doctrine of collateral estoppel because [his] Eighth

18  Amendment deliberate indifference claims were already fully decided on the merits by the

19  Monterey County Superior Court." Dkt. 68 at 2.[5]

20

21  [4] Plaintiff initially filed multiple declarations in support of his "[cross]-motion for summary
    judgment," but he did not file a separate document entitled, "Cross-Motion for Summary

22  Judgment." Dkts. 60-63. Instead, Plaintiff filed a reply to Defendants' opposition, which was
    entitled, "Plaintiff['s] Motion of Objections [to] Defendants['] Opposition for Summary

23  Judgment[;] Cross-Motion to Dismiss Defendants['] Motion for Summary Judgment," which the
    court construes as his cross-motion. Dkt. 69.

24  [5] In support of their argument relating to collateral estoppel, Defendants filed an implied request
    for judicial notice ("RJN"). Dkt. 68 at 6-7. It appears that Defendants request that the court take

25  judicial notice of the existence and content of Plaintiff's state habeas petition, filed in the
    Monterey County Superior Court, Case No. HC 8488. *Id.* at 6 (citing Dkt. 60 at 72-77). Good

26  cause appearing, Defendants' implied RJN is GRANTED. The court may take judicial notice of
    the aforementioned document, because "a court may take judicial notice of its own records in

27  other cases, as well as the records of an inferior court in other cases." *United States v. Wilson*, 631
    F.2d 118, 119 (9th Cir. 1980).

28

3

Having read and considered the papers submitted in connection with this matter, the court GRANTS Defendants' motion for summary judgment and DENIES Plaintiff's cross-motion.

## II.    FACTUAL BACKGROUND[6]

### A.    The Parties

At the time of the events set forth in his complaint, Plaintiff was a state prisoner incarcerated at CTF.  *See* Dkt. 6 at 4.

Also during the time frame at issue, Defendant Ahmed was Plaintiff's PCP for approximately twenty-five months.  Ahmed Decl. ¶ 4.  Defendant Chudy was also a staff physician at CTF for approximately twelve and one-half years, until his retirement in June 2014. Chudy Decl. ¶ 1.  Defendant Bright has worked at CTF as both a staff physician and Chief Physician and Surgeon.  Bright Decl. ¶ 2.  Defendant Sepulveda was the CMO and CME at CTF from October 2009 until his retirement in 2011.  Sepulveda Decl. ¶ 4.  Defendant Adams took over as CME at CTF from August 2012 to August 2014.  Adams Decl. ¶ 1.  Defendant Ellis is the current CEO at CTF.  Ellis Decl. ¶ 1.

### B.    Plaintiff's Version

As mentioned above, Plaintiff alleges that Defendants were deliberately indifferent to his medical needs by failing to give him specific accommodations that he received at previous prisons and by providing inadequate medical treatment for his pain and suffering when they weaned him

---

[6] This Order contains many acronyms.  Here, in one place, they are:

| | |
|---|---|
| ARP | *Armstrong* Remedial Plan |
| CDCR | California Department of Corrections and Rehabilitation |
| CCHCS | California Correctional Health Care Services |
| CTF | California Training Facility |
| CEO | Chief Executive Officer |
| CME | Chief Medical Executive |
| CMO | Chief Medical Officer |
| eUHR | Electronic Unit Health Record |
| ICAB | Inmate Correspondence and Appeals Branch |
| IMSP&P | Inmate Medical Services Policies and Procedures |
| NSAIDs | Non-Steroid Anti-Inflammatory Drugs |
| OOA | Office of Appeals |
| PCP | Primary Care Physician |
| PLRA | Prison Litigation Reform Act of 1995 |
| UHR | Unit Health Record |

off morphine without providing alternative pain medications.  *See* Dkt. 6 at 4-9.

Plaintiff arrived at CTF on September 9, 2013.  *Id.* at 4.  Plaintiff alleges he suffers from: "neck pain c4-c5 degenerative joint disease, and thoracic spine T5, T6 and T7, [his] cervical spine fusion between the vertebrae of C2 and C3, degenerative dis(c) disease at C5-[C]6, his arthritis [o]n carpomelacarpal joints[7] with an old fracture[d] wrist that swells up every time."  *Id.* at 4.  He also claims that he has: "serious nerve entrapment neuropathy"; constant pain in his neck, shoulders, arms, hands, left knee, legs, and feet; and his "left testis split in half."  *Id.* at 5, 7, 9. Plaintiff states that he has been taking around seven to eight pills a day, and that his "stomach bleed[s] sometimes due to taking that medication."  *Id.* at 8.  Plaintiff generally alleges that his "[w]hole body [was] in serious pain and all the doctors wou[ld]n't help [him] . . . ."  *Id.* at 7. Plaintiff further asserts that his "life [was] in danger" because Defendants took away his accommodations/chronos for a "lower bunk, extra mattress, extra pillow, back brace, and orthotics boots, plus the morphine 2 X a day."  *Id.* at 6.  Because Plaintiff was denied such "chronos" and treatment, he claims that he suffered "excruciating pain all day and night."  *Id.* at 8.  Plaintiff claims he also was denied a disability classification of "high risk" or a classification as medically "unassigned," which meant that he would not be required to work.  *Id.* at 3, 7.

**C.    Defendants' Version**

**i.    Plaintiff's Medical Complaints, Conditions, and Treatment at CTF**

When Plaintiff arrived at CTF, he reported that he suffered from chronic lower back pain, nerve damage in his neck, shockwaves from his neck down to his arms and fingers, pain all day and night, and an inability to sleep.  Ahmed Decl. ¶ 6.  In addition, according to his medical records, Plaintiff has "moderate degenerative joint diseases of the carpal bones (wrists), and mild-to-moderate arthritis in his knees, back, and neck."  Adams Decl. ¶ 13.

On September 24, 2013, Defendant Ahmed first examined Plaintiff as his PCP.  Ahmed Decl. ¶ 6, Ex. A.  Plaintiff mentioned that "he had prior surgery on his lumbar spine at L3, 4, and

---

[7] The carpometacarpal joints are any of the joints formed by the distal row of carpal bones and the bases of the metacarpals.  *See* http://medical-dictionary.thefreedictionary.com/carpometacarpal+joint (last visited Sept. 18, 2017).

5, and cervical spine, and his T-spine[8] had anterior wedging.[9]" *Id.* (footnotes added). According to Defendant Ahmed, Plaintiff "reported the fusion did not help and he was still on pain medications and had difficulty walking up stairs to an upper tier." *Id.* During the September 24, 2013 examination, Defendant Ahmed confirmed Plaintiff's chronic lower back pain and issues regarding his spine. *Id.* Defendant Ahmed ordered two x-rays to evaluate further Plaintiff's medical complaints related to his lumbar spine and foot, renewed his prescription for morphine sulfate extended release to address his pain, and wrote up an accommodation chrono requesting a ground floor cell, bottom bunk, specialty shoes, extra pillow, and extra mattress. *Id.*

Between September 24, 2013 and October 10, 2015, Plaintiff's electronic Unit Health Record ("eUHR") "document[ed] that [he] was seen by multiple health care providers and continuously evaluated by [Defendant Ahmed], his [PCP], and provided with various pain medications to treat his numerous complaints related to lower back pain, neck pain, pain radiating from his neck down to she shoulders, arms and fingers, [as well as] arthritis in his wrists, and his feet." *Id.* ¶ 8.

The record further shows that during the twenty-five months Plaintiff was incarcerated at CTF, he filed fifteen Health Care Services Request Forms and each one was timely responded to, initially by nursing staff. *Id.* ¶ 7. Further, medical staff (including various doctors and nurses) at CTF examined Plaintiff over fifty times during this time frame. *Id.* In particular, Defendant Ahmed evaluated Plaintiff on twenty-five different occasions, continuously prescribed various medications to treat his pain, ordered x-rays and diagnostic tests when needed, provided for a specialty consultation with a urologist, and dealt with his requests for comprehensive accommodation chronos. *Id.*

The radiology reports of x-rays taken during Plaintiff's incarceration at CTF provide more

---

[8] T-spine is short for thoracic spine.

[9] Wedging is "weakening of the vertebra," and this weakening is seen in patients with osteoporosis or thinning bones, which can result in painful fractures. *See* http://www.webmd.com/osteoporosis/default.htm (last visited Sept. 18, 2017); *see also* http://www.webmd.com/osteoporosis/guide/spinal-compression-fractures-causes#1-2 (last visited Sept. 18, 2017).

6

information as to Plaintiff's ailments.  *Id.* ¶¶ 9-12, Exs. B-E; Bright Decl. ¶ 16.  The first radiology report, relating to Plaintiff's lumbar spine and dated October 3, 2013, revealed as follows: age appropriate bone mineralization; chronic appearing compressions deformity of L5, including mild degeneration of the lower lumbar spine; mild scoliosis; and asymmetric disc space narrowing at L4-5.  Ahmed Decl. ¶ 10, Ex. B.  The second radiology report, relating to Plaintiff's left foot and also dated October 3, 2013, revealed he had a bunion and "degenerative changes[10] at the joint of the big toe."  *Id.* (footnote added), Ex. C.  The radiology report of the x-ray of Plaintiff's neck, dated June 16, 2014, concluded that he had degenerative disc disease at C4-C5, noting mild to moderate degenerative disc "narrowing and spurring" at the C4-C5 vertebrae.  *Id.*; Ex. D.  Another radiology report, relating to Plaintiff's right wrist and dated July 21, 2014, noted "evidence of an old triquetral[11] fracture, moderate degenerative changes in the carpus [or wrist] and at multiple carpometacarpal and interphalangeal articulations[12], [and] finding [Plaintiff] has degenerative joint disease [in his wrist]."  *Id.* (footnotes added); Ex. E.  Finally, Plaintiff's August 4, 2014 radiology report, relating to his T5, T6, and T7 vertebrae, showed that he had a very mild wedging of his T5, T6, and T7 vertebrae, which could be from old, "well healed," small compression fractures. Bright Decl. ¶ 16.

According to Defendant Ahmed, although Plaintiff complained about his treatment for gout during his incarceration at CTF, his medical record shows that he did not have the gout. Ahmed Decl. ¶ 28.  Plaintiff's uric acid levels were normal, and thus he did not meet the criteria for gout.  *Id.*

---

[10] The phrase "degenerative changes" refers to osteoarthritis, commonly known as wear and tear arthritis.  It is associated with a breakdown of cartilage in joints and can occur in almost any joint in the body.  *See* http://www.webmd.com/osteoarthritis/guide/osteoarthritis-basics#1 (last visited Sept. 18, 2017).

[11] The triquetral bone is the bone in the proximal row of the carpus that is third counting from the thumb side of the wrist, has a pyramidal shape, and is situated between the lunate and pisiform bone.  *See* https://www.merriam-webster.com/medical/triquetral%20bone (last visited Sept. 18, 2017).

[12] The interphalangeal joints of the hand are the hinge joints between the phalanges of the fingers. *See* Stedman's Medical Dictionary, at 990 (28th ed. 2006).

Furthermore, Defendants aver that Plaintiff's UHRs show no evidence that his left testis or testicle split in half. Bright Decl. ¶ 24. The ultrasound ordered by Defendant Ahmed in June 2015 found that Plaintiff had a testicular cyst. Ahmed Decl. ¶ 27, Ex. S. Although Plaintiff's testicular cyst bothered him at that time, it did not affect his daily living, which is a requirement for providing medical specialty consults to inmates. *Id.*; Bright Decl. ¶ 24.

Finally, according to Defendant Ahmed, Plaintiff's request to be designated as having an "unassigned" or "high risk" disability classification (again, meaning he would not be required to work) was not medically justified on the basis of only his mild-to-moderate arthritis. Ahmed Decl. ¶ 26, Ex. R. Plaintiff was classified appropriately for his health care conditions as a medium medical risk because, at the time, he was able perform all activities of daily independent living. *Id.*

### ii. Plaintiff's Pain Management and Pain Medications

According to Plaintiff's medical records, he was seen by multiple health care providers and continuously provided with various pain medications, including: non-steroid anti-inflammatory drugs ("NSAIDs"); Sulindac 200 mg. twice a day; Ibuprofen 400 mg. one tablet three times a day; Ibuprofen 800 mg. three times a day as needed; Tylenol 650 mg. twice a day; as well as Motrin, Tegratol (Carbamazepine), Naproxen, Neurontin, and Tramadol Baclofen (for both pain and muscle spasms). Adams Decl. ¶ 13; Ahmed Decl. ¶ 19. Plaintiff also was referred to physical therapy. Adams Decl. ¶ 13.

In May 2014, Plaintiff was weaned off of his 15 mg. dose of extended release morphine, in part because a May 9, 2014 progress note documented that prison staff and Defendant Ahmed witnessed Plaintiff playing basketball. *Id.*; Ahmed Decl. ¶¶ 15-16, Ex. G.

On May 15, 2014, a pain management review committee agreed with Defendant Ahmed's recommendation to wean Plaintiff off of morphine and to give him Tylenol for his pain. Ahmed Decl. ¶ 16, Ex. H; Bright Decl. ¶ 19, Ex. O. Plaintiff's subsequent requests for morphine were denied because he did not have objective evidence of severe disease, as required by prison pain management guidelines, and there was no medical evidence that narcotics would treat his chronic low back pain better than the NSAIDS or Tylenol he already was receiving. Bright Decl.

¶¶ 18(A), 23.

Under the California Correctional Health Care Services ("CCHCS") Pain Management Guidelines, prescriptions for chronic narcotics, such as morphine, are restricted to those with objective evidence of severe disease. Ahmed Decl. ¶ 17. Narcotic therapy is an absolute contraindication in patients with no objective evidence of severe disease or pathology. *Id.* Even though Plaintiff previously was prescribed morphine, prescriptions for such medications are reevaluated for medical necessity. *Id.* ¶ 18. After repeated evaluations by his PCP, Plaintiff was provided with alternative means for pain management, as medically indicated, based on objective findings, his functional status, and the aforementioned policies. *Id.* Plaintiff's ability to play basketball contraindicated evidence of any severe disease or pathology. *Id.* According to Defendant Ahmed, Plaintiff's pain was caused by degenerative disc disease and the aging process, and his degenerative disc disease was not severe enough to warrant the use of narcotic medications such as morphine. *Id.* ¶ 19. Rather, NSAIDs were appropriate under the circumstances. *Id.*

### iii. Plaintiff's Comprehensive Accommodation Chronos

In general, each inmate arriving at CTF with a comprehensive accommodation chrono is allowed to retain the accommodation until it is reviewed under the guidelines specified by the CCHCS's Comprehensive Accommodation Formulary and verified by healthcare staff. Bright Decl. ¶ 8, Exs. A & B; Ahmed Decl. ¶ 20(a), Ex. H.

Prior to his arrival at CTF in September 2013, Plaintiff received accommodations that included a lower bunk, extra mattress, soft shoes, extra pillow, boots, as well as back and knee braces. Bright Decl. ¶ 9.

When Plaintiff arrived at CTF, Defendant Ahmed's initial accommodation requests—for Plaintiff to receive a ground floor cell, bottom bunk, specialty shoes, an extra pillow, and an extra mattress—were initially approved because Plaintiff had received these items at his prior prison and, as noted above, the policy was to continue such accommodations until reevaluated at the inmate's new prison. Bright Decl. ¶ 10; Ahmed Decl. ¶ 20(a), Exs. A & H; Adams Decl. ¶ 7.

Thereafter, even though Defendant Ahmed again requested such accommodations for Plaintiff, they were denied because they were not medically necessary. Bright Decl. ¶ 17; Ahmed

9

Decl. ¶¶ 21- 22; Adams Decl. ¶ 14. Defendant Ahmed claims that he made the requests only after Plaintiff continued to ask for the accommodations, as he was trying to address Plaintiff's concerns. Ahmed Decl. ¶¶ 20-21, Exs. A, I-M. Defendant Ahmed's requests for such comprehensive accommodation chronos for Plaintiff were made on September 24, 2013, October 23, 2013, March 5, 2014, April 9, 2014, June 24, 2014, and August 13, 2014. *Id.*

Defendant Adams, as CME at CTF, reviewed the PCPs' requests for comprehensive inmate-patient accommodations to ensure they met the criteria established by the Inmate Medical Services Policies and Procedures ("IMSP&P") based on evidence and documentation submitted from an inmate-patient's eUHR. Adams Decl. ¶¶ 1, 6. On October 2013 and March 2014, Defendant Adams evaluated Defendant Ahmed's requests for accommodation chronos, including a bottom bunk, orthopedic shoes, an extra mattress, and an extra pillow. *Id.* ¶¶ 8-9. Defendant Adams granted the March 2014 accommodation request for an extra pillow, but denied all other accommodation requests because the medical justification documentation submitted with the chronos did not meet the required criteria established by the IMSP&P. *Id.* Another subsequent request for accommodation for Plaintiff by Defendant Ahmed that was not overruled was a request for a cock-up wrist splint,[13] which was granted by Defendant Bright, who was Chief Physician and Surgeon at CTF, in April 2014. Bright Decl. ¶ 13, ¶ 18(A), Ex. G.

There is no medical evidence or diagnostic information that any health care provider's decisions between September 28, 2013 to October 10, 2015, denying Plaintiff's requests for specific accommodations—namely, a ground-floor cell, extra pillow, extra mattress, lower bunk, and orthopedic shoes—were medically unacceptable under the circumstances or resulted in injuries to Plaintiff. Adams Decl. ¶ 14; Bright Decl. ¶¶ 16-17.

### iv. Plaintiff's Relevant 602 Appeals

If an inmate-patient does not agree with a health care policy, action, or decision, the inmate-patient may submit a 602 appeal to the institution's Health Care Appeal Coordinator, who

---

[13] A cock-up wrist splint is a type of wrist hand brace or orthosis, which may be used to treat a wide range of conditions localized at or near the wrist and hand. *See* http://orthopedia.wikia.com/wiki/Cock-Up_Wrist_Splint (last visited September 13, 2017).

then will initiate the statewide formal inmate-patient grievance process (also known as the Health Care Appeal Process).  Bright Decl. ¶ 5; Robinson Decl. ¶ 2.  If the health care appeal is denied in whole or in part, the inmate-patient may pursue the health care appeal through several levels, culminating in a Director's Level decision, the findings of which are based on an investigation of and review into the medical treatment provided to the specific inmate-patient.  Robinson Decl. ¶ 6.

The Inmate Correspondence and Appeals Branch ("ICAB") is responsible for the oversight and management of the Health Care Appeal Process, including receiving and maintaining health care-related grievances and rendering decisions on such appeals.  Robinson Decl. ¶ 3.  Meanwhile, the Office of Appeals ("OOA") "receives, reviews, and maintains all third level inmate appeals concerning non-health care issues."  *Id.*  The OOA had "five accepted and exhausted administrative appeals for [Plaintiff] during his entire time of incarceration that reached a final decision at the third level of review, and only one which was initiated during his incarceration at [CTF]," log no. CTF S-14-01310, in which Plaintiff asserts that his personal property was lost.  Voong Decl. ¶¶ 6-7.  Meanwhile, ICAB maintains a file with health care appeal-related documents concerning Plaintiff.  Robinson Decl. ¶ 4.  ICAB Personnel searched Plaintiff's appeal file for any health care appeals originating from CTF for the period of September 9, 2013 through October 10, 2015, and discovered that Plaintiff initiated seven health care appeals during this time frame.  *Id.* at ¶ 8.  Out of these seven appeals, the record shows that Plaintiff only exhausted three appeals to the Director's level of review: CTF-HC-14040584; CTF-HC-14000415; and CTF-HC-14041350.  *Id.* at ¶ 22.  Meanwhile, Plaintiff asserts in his complaint that he exhausted the following inmate appeals related to the issues in this case: log nos. CTF-HC-14040584; CTF-HC-14000415; and CTF S-14-01979.  Dkt. 6 at 1-2.

The court will elaborate below on these three health care appeals that were pursued to the Director's level of appeal.  The court will also elaborate on one health care appeal that was not pursued to the final level of review (CTF S-14-01979).

a.  Health Care Appeal Log No. CTF-HC-1404584 ("CTF-HC-1404584")

On May 21, 2014, in CTF-HC-14040584, Plaintiff requested: (1) to be seen by a doctor to place a soft cast on his right wrist; (2) a cock-up wrist splint; (3) his nerve pain medication,

Neurontin, to treat his nerve damage, chronic lower back pain, and arthritis; and (4) morphine. Robinson Decl. ¶ 11, Ex. D.

On June 24, 2014, at the first level of review, Defendant Ahmed partially granted Plaintiff's request for a cock-up wrist splint, which was approved previously on April 11, 2014, and noted Plaintiff already had received it. *Id.* Following an interview of Plaintiff and a review of his eUHR as well as departmental policies and procedures, Defendant Ahmed denied Plaintiff's other requests (for a soft cast, Neurontin, and morphine) because there was no indication Plaintiff needed the cast and he did not meet the criteria for the medications. *Id.*

Similarly, on August 27, 2014, Defendant Bright partially granted the appeal at the second level of review, stating that he: (1) granted the request for a cock up wrist splint (as mentioned above); (2) denied Plaintiff's request for a soft cast, because there was no medical indication Plaintiff needed one; and (3) denied Plaintiff's request for morphine because of a lack of objective evidence of severe disease (as required by prison pain management guidelines) and a lack of evidence that narcotics treat chronic low back pain better than the NSAIDs or Tylenol that Plaintiff was receiving. *Id.* On September 2, 2014, Defendant Ellis reviewed the second level response in order to ensure that staff correctly implemented the regulatory standards and protocols. *Id.*

Dissatisfied with the second level response, Plaintiff submitted his grievance to the third level for review. *Id.* ¶ 13. On December 30, 2014, following a detailed review of Plaintiff's UHR, CCHCS Deputy Director J. Lewis denied CTF-HC-14040584 at the Director's level of review noting that Plaintiff's medical condition had been evaluated and he was receiving treatment deemed medically necessary. *Id.*

   b. Health Care Appeal/Staff Complaint Log No. CTF-HC-14000415 ("CTF-HC-14000415")

In CTF-HC-14000415, Plaintiff alleged a staff complaint against Defendant Ahmed asserting medical malpractice, negligence, reckless liability, inadequate medical care, and deliberate indifference. *Id.* ¶ 16, Ex. F. Plaintiff requested: (1) to be seen by another doctor at the facility; and (2) to receive stronger medication for joint disease, arthritis, a fractured wrist,

shockwaves, neck pain, and carpometacarpal. *Id.*

On December 15, 2014, CTF-HC-14000415, which was bypassed at the first level of review, was sent directly to the second level of review. *Id.* On January 20, 2015, Defendant Bright interviewed Plaintiff regarding his claims against Defendant Ahmed. *Id.* On January 21, 2015, Defendant Bright issued a second level response finding that staff did not violate CDCR policy. *Id.*

On January 24, 2015, Defendant Ellis reviewed the second level response, ensuring that staff correctly implemented the regulatory standards and protocols in adjudicating this response. *Id.*

Dissatisfied with the second level response, Plaintiff submitted CTF-HC-14000415 to the Director's level for review on February 3, 2015. *Id.* at ¶ 17. On March 16, 2015, CTF-HC-14000415 was denied at the Director's level. *Id.*

        c.   CDC Form 1824/Heath Care Appeal Log No. CTF S-14-01979 ("CTF S-14-01979"

CTF S-14-01979 was originally filed on November 13, 2014, as a Reasonable Modification or Accommodation Request, or CDC Form 1824. Truett Decl. ¶ 13, Ex. H. A disabled inmate may use a CDC Form 1824 to request a specific reasonable modification or accommodation that, if granted, would enable the inmate to participate in a service, activity, or program offered by the facility, for which the inmate is otherwise qualified/eligible to participate. *Id.* at ¶ 13. Such requests are verified by medical staff to determine if the inmate has a disability covered by the Americans with Disabilities Act. *Id.* Because CTF S-14-01979 included both issues covered by the *Armstrong* Remedial Plan ("ARP")[14] (requests for back brace, lower bunk, neck brace, and removal from job assignment in education) and non-ARP issues (pain medications, medical treatment, and classification as high risk of care), Plaintiff was advised that

---

[14] *Armstrong v. Brown*, N. D. Cal. No. C 94-2307 CW ("*Armstrong*"), is a class action concerning disability accommodations for prisoners and parolees in the CDCR. The *Armstrong* "court ordered Remedial Plan," as amended January 3, 2001 ("*Armstrong* Remedial Plan" or "ARP"), requires the CDCR "to ensure that prisoners and parolees with disabilities are accessibly housed, that they are able to obtain and keep necessary assistive devices, and that they receive effective communication regarding accommodations." *Armstrong v. Brown*, No. 94-2307 CW, Docket # 1974 (Order filed Jan. 13, 2012).

1   his non-ARP issues would be forwarded to health care staff for review and processing as a

2   separate Health Care Appeal. *See id.* (CDC Form 695 attached to CDC Form 1824).

3       In order to adjudicate claims involving the issues covered by the ARP in CTF S-14-01979,

4   it would have been necessary to verify first whether Plaintiff had a disability. *Id.* at ¶ 13. If a

5   disability were verified, then a determination could be made as to whether a specific requested

6   accommodation was reasonable. *Id.* Here, the process of determining whether Plaintiff's claimed

7   disabilities could be verified included a review of his eUHR and medical evaluations by Defendant

8   Ahmed on November 21 and December 9, 2014, as well as the three Health Care Services

9   memoranda issued November 25, 2015 and December 11, and 24, 2014, which summarized

10  Plaintiff's disability claims. *Id.* After conducting this review, the reviewer concluded that

11  Plaintiff's claims of disability could *not* be verified. *Id.* Therefore, on December 30, 2014, CTF

12  S-14-01979 was screened at the first level of review and canceled. *Id.*

13      As noted on the screening form provided to Plaintiff, under Title 15 of the California Code

14  of Regulations § 3084.6(e), once a grievance is cancelled, that appeal may not be resubmitted, but

15  a separate appeal may be filed on the cancellation decision. *Id.* Nothing in the record indicates

16  that Plaintiff did anything to appeal the cancellation decision related to CTF S-14-01979. *Id.* The

17  cancellation of CTF S-14-01979 did not affect the portion of Plaintiff's grievance that was split-

18  off as a health care appeal, and which was given another log number, CTF-HC-14041350.

19          d.   Heath Care Appeal Log no. CTF-HC-14041350 ("CTF-HC-14041350")

20      As mentioned above, the non-ARP issues in CTF S-14-01979 were split-off as a separate

21  health care appeal—CTF-HC-14041350, in which Plaintiff requested: (1) classification as "high

22  risk"; (2) medications to treat "24 hour shockwaves from my neck to my fingertips"; (3) a chrono

23  for a lower bunk/lower tier; (4) a back brace; (5) a chrono to be categorized as unassigned; and

24  (6) medications for pain associated with degenerative disc disease. Robinson Decl. ¶ 18, Ex. G.

25  As part of the first level of review for CTF-HC-14041350, Defendant Ahmed interviewed

26  Plaintiff. *Id.* at ¶ 19. On December 10, 2014, Defendant Ahmed partially granted CTF-HC-

27  14041350 at the first level of review, noting Plaintiff had an active prescription for Motrin to help

28  manage his pain associated with degenerative joint conditions. *Id.* Furthermore, Defendant

14

Ahmed: (1) offered Plaintiff Elavil, which he declined; (2) referred him to physical therapy; and (3) advised him to lose weight to help alleviate pain and improve his overall health. *Id.* The remaining issues in CTF-HC-14041350 were denied because: there was no pain medication to treat "24 hour shockwaves from [his] neck to [his] fingertips"; chronic use of a back brace for chronic low back pain weakens the back muscles rather than strengthens them; and Plaintiff did not meet established criteria in the IMSP&P for a lower bunk/lower tier, back brace, or unassigned status. *Id.*

Dissatisfied with the aforementioned decision at the first level of review, Plaintiff submitted his grievance for a second level of review. *Id.* at ¶ 20. Defendant Bright partially granted CTF-HC-14041350, finding he was receiving Motrin, which was an appropriate medication for pain associated with degenerative disc disease, but noting they did not have medications that "removed all pain or discomfort" i.e., to treat "24 hour shockwaves from [his] neck to [his] fingertips." *Id.* Defendant Bright also denied Plaintiff's request for a lower bunk assignment, because he did not have one of the conditions that required such a bunk under IMSP&P, Volume 4, Chapter 23. *Id.* Plaintiff's request for a back brace also was denied because there was no medical evidence showing that back braces decreased pain or improved function. *Id.* Similarly, Plaintiff's request to receive "unassigned" status was denied because he had the ability to work. *Id.*

Again, Plaintiff was dissatisfied with the decision at the second level of review, and so he submitted CTF-HC-14041350 to the Director's level of review. *Id.*, Ex. G. On May 7, 2015, Deputy Director Lewis denied CTF-HC-14041350 upon finding that, after review, "no intervention at the [Director's level of review] [was] necessary as [Plaintiff's] medical condition [had] been evaluated and [he was] receiving treatment deemed medically necessary." *Id.* at ¶ 21. Deputy Director Lewis further noted that any new issues Plaintiff attempted to add at the Director's Level Review (i.e. requests for morphine, an extra mattress, extra pillow, and soft shoes) were not appropriate and would not be addressed, because Plaintiff did not provide evidence that he attempted to address them at the first level of review as required by Title 15 of the California Code of Regulations § 3084.1(b). *Id.*

15

### III.    DISCUSSION

#### A.    Defendants' Motion for Summary Judgment

##### i.    Legal Standard for Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must demonstrate affirmatively that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The court is concerned only with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.*  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence

submitted by the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

When the parties file cross-motions for summary judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party.  *The Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001).

The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment.  *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).  The defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."  *Id.* at 1172.  If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Id.*  The ultimate burden of proof remains with defendants, however.  *Id.*  "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts."  *Id.* at 1166.

### ii.    Evidence Considered

A district court may consider only admissible evidence in ruling on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

In support of their dispositive motion, Defendants have presented their own declarations and supporting exhibits, as well as declarations and supporting exhibits from the following: ICAB Chief R. Robinson; OOA Chief M. Voong; and CTF Appeals Coordinator J. Truett.  Dkts. 48-55; 79-1.

Meanwhile, Plaintiff filed a verified complaint (dkt. 6), verified reply (dkt. 69), as well as verified oppositions, declarations and supporting exhibits in support of his oppositions thereto (dkts. 58-63).  The court construes these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

### iii.    Applicable Law

Deliberate indifference to serious medical needs violates the Eighth Amendment's

proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of a defendant's response to that need. *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

To prevail on this claim, the plaintiff must show that his medical needs were objectively serious and that the defendants possessed a sufficiently culpable state of mind. *See id.* at 1060; *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

Regarding the second element, deliberate indifference is a disregard of harm of which the actor is actually aware. *Farmer v. Brennan*, 511 U.S. 825, 838-42 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A defendant is liable only if he knows that the plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. A mere difference of opinion as to which medically-acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir. 2004).

In the context of deliberate indifference to serious medical need, an administrator or supervisor may be liable if, for instance, he or she fails to respond to a prisoner's request for help. *Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006). "It has long been clearly established that supervisory liability is imposed against a supervisory official in his individual capacity for his own

18

culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (internal brackets, quotation marks, and citations omitted). A supervisor therefore generally is liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quotation marks and citation omitted). "The requisite causal connection can be established . . . by setting in motion a series of acts by others, . . . or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks and citation omitted).

### iv. Analysis

#### a. Claim Relating to Grievance Process

As explained in the factual background above, Defendants Ahmed, Bright, Ellis, and Adams reviewed some of Plaintiff's grievances, and Defendants Chudy and Sepulveda were not involved in the adjudication of Plaintiff's administrative grievances. However, other than making broad and conclusory statements, Plaintiff did not raise separate claims relating to the actions of Defendants Ahmed, Bright, or Ellis concerning their adjudication of Plaintiff's inmate grievances. *See* Dkt. 6. Even if Plaintiff had sued these Defendants due to their involvement in handling his grievances, such a claim would fail. Although there is a First Amendment right to petition the government for redress of grievances, there is no right to a response or any particular action. *See Flick v. Alba*, 932 F.2d 728 (8th Cir. 1991) ("prisoner's right to petition the government for redress . . . is not compromised by the prison's refusal to entertain his grievance."). Any claim based on the simple failure to grant administrative appeals or process them properly is not cognizable in a section 1983 action because there is no constitutional right to a prison administrative appeal or grievance system for California inmates. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). Accordingly,

any such claim against Defendants Ahmed, Bright, Ellis, and Adams relating to the grievance process is DISMISSED with prejudice.[15]

                b.  Failure to Exhaust Administrative Remedies as to Certain Medical Claims

Defendants argue that Plaintiff did not exhaust available administrative remedies regarding certain medical claims asserted in the complaint and also did not exhaust claims about the adjudication of administrative grievances, as required by the PLRA. Dkt. 47 at 22-23. Specifically, Defendants point out that Plaintiff only exhausted three health care appeals, and the relevant issues exhausted were "related to morphine [request], chronic lower back pain, arthritis (CTF-HC-14040583), stronger medication for joint disease, arthritis, fractured wrist, shockwaves, neck pain, carpometacarpal (CTF-HC-1400415); and pain medications for degenerative disc disease, classification as 'high risk,' chronos for lower bunk/lower tier, back brace, and 'unassigned' [classification]" (CTF-HC-14041350, which was originally part of CTF S-14-01979). *Id.* at 22. Thus, Defendants argue that ten allegations in Plaintiff's complaint are not the same as the allegations contained in his three exhausted health care appeals, numbers CTF-HC-14040584, CTF-HC-14000415, and CTF-HC-14041350. *Id.* (citing Robinson Decl. ¶ 22). Plaintiff never submitted grievances to the third and final level of review, grieving the following ten allegations: (1) denial of an extra pillow; (2) no pillow; (3) denial of an extra mattress; (4) denial of orthotic boots; (5) pain in his left knee; (6) pain in his left shoulder; (7) feet swelling; (8) "left testis split in half" (9) dying, i.e., "life in danger"; or (10) stomach bleeding due to medication. *Id.* (citing Truett Decl. ¶ 15; Voong Decl. ¶ 8). Thus, Defendants argue that Plaintiff did not exhaust his administrative remedies as to these claims, and they are entitled to summary judgment on each of the claims. *Id.*

Before turning to its analysis, the court briefly reviews the requirements of the PLRA and administrative review process applicable to California prisoners.

                1.  Legal Framework

---

[15] Because Plaintiff's claims relating to any defendant's involvement in the grievance process have been dismissed, the court need not address the alternative arguments that Plaintiff failed to exhaust his administrative remedies as to such claims.

The PLRA requires a prisoner to exhaust "available administrative remedies" before bringing an action with respect to prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion of all "available" remedies is mandatory; those remedies neither need meet federal standards, nor must they be "plain, speedy, and effective." *Booth v. Churner*, 532 U.S. 731, 739-40 (2001). The PLRA requires *proper* exhaustion of administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Thus, compliance with prison grievance procedures is required by the PLRA to exhaust properly. *Id.* The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 84.

The CDCR provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).[16]

As mentioned above, to initiate an appeal, the inmate or parolee must submit a 602 appeal or grievance describing the issue to be appealed to the Appeals Coordinator's office at the institution or parole region for receipt and processing. *Id.* § 3084.2(a)-(c). The level of detail in an administrative grievance necessary to exhaust a claim properly is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007). The level of specificity required in the appeal is described in the California Code of Regulations as follows:

> The inmate or parolee shall list all staff member(s) involved and

---

[16] The regulations pertaining to the inmate appeal process were amended effective January 28, 2011. As explained above, Plaintiff's grievances were submitted *after* January 28, 2011; therefore, the amended regulations were in effect and govern his grievances.

shall describe their involvement in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal.

Cal. Code Regs. tit. 15, § 3084.2(a)(3) (emphasis added).

The CDCR's appeal process consists of three formal levels of appeals: (1) first formal level appeal filed with one of the institution's appeal coordinators, (2) second formal level appeal filed with the institution head or designee, and (3) Director's Level or the third formal level appeal filed with the CDCR director or designee. *Id.* § 3084.7.[17] A prisoner exhausts the appeal process when he completes the third level of review. *Id.* § 3084.1(b); *Harvey v. Jordan*, 605 F.3d 681, 683 (9th Cir. 2010). A "cancellation or rejection" of an appeal "does not exhaust administrative remedies." Cal. Code Regs. tit. 15, § 3084.1(b).

2. Defendants' Initial Burden of Proving a Failure to Exhaust

As mentioned above, Plaintiff submitted multiple inmate grievances while he was at CTF, including three health care appeals that culminated in a Director's Level Decision, and one health care appeal that was cancelled. *See supra* Factual Background II.C.4. Defendants claim that Plaintiff only exhausted three health care appeals, and the relevant exhausted issues were related to: morphine [request], chronic lower back pain, arthritis (CTF-HC-14040583); stronger medication for joint disease, arthritis, fractured wrist, shockwaves, neck pain, and carpometacarpal (CTF-HC-1400415); and pain medications for degenerative disc disease, classification as "high risk," chronos for lower bunk/lower tier, back brace, and "unassigned" classification (CTF-HC-14041350). Dkt. 47 at 22. Thus, Defendants argue that the remaining ten allegations relating to the Eighth Amendment claim in Plaintiff's complaint are not contained in his three exhausted health care appeals, CTF-HC-14040583, CTF-HC-1400415, and CTF-HC-14041350. *Id.* (citing Robinson Decl. ¶ 22). The record shows that in one health care appeal, CTF S-14-01979, Plaintiff requested the following (i.e., the issues covered by the ARP): requests for back brace; lower bunk; neck brace; and removal from his job assignment in education. Truett Decl. ¶ 13, Ex. H.

---

[17] Under the regulations, as amended effective January 28, 2011, the informal grievance level has been omitted, and there are now only three levels: first level appeal, second level appeal, and third level appeal. *See* Cal. Code Regs. tit. 15, § 3084.7.

1    However, CTF S-14-01979 was cancelled at the first level of review, and nothing in Plaintiff's

2    prison records show that he took the necessary corrective action in order to pursue CTF S-14-

3    01979 by appealing the cancellation decision.

4         The court finds that there is nothing in Plaintiff's prison record showing that he submitted

5    grievances to the final level of review appealing medical claims related to the following ten

6    allegations: (1) denial of an extra pillow; (2) no pillow; (3) denial of an extra mattress; (4) denial

7    of orthotic boots; (5) pain in his left knee; (6) pain in his left shoulder; (7) feet swelling; (8) "left

8    testis split in half"; (9) dying, i.e., "life in danger"; or (10) stomach bleeding due to medication.

9    Defendants claim he did not exhaust his administrative remedies as to these claims, and they are

10    entitled to summary judgment on those claims.  Dkt. 47 at 22.  Furthermore, Plaintiff was advised

11    that he could appeal the cancellation of CTF S-14-01979, but nothing in his prison record shows

12    that he did so.  Because the "cancellation" of CTF S-14-01979 "does not exhaust administrative

13    remedies," *see* Cal. Code Regs. tit. 15, § 3084.1(b), and because there is nothing in the record

14    showing that Plaintiff exhausted his administrative remedies as to the aforementioned ten

15    allegations, the evidence submitted by Defendants satisfies their initial burden of proving that

16    there were available administrative remedies for Plaintiff, and that Plaintiff failed to exhaust those

17    remedies properly, *see Albino*, 747 F.3d at 1172.

18            3.  Plaintiff's Burden of Proving Unavailability of Administrative Remedies

19         Defendants adequately have shown that there were available administrative remedies that

20    Plaintiff did not exhaust fully as to his medical claims relating to the aforementioned ten

21    allegations.  As such, the burden shifts to Plaintiff "to come forward with evidence showing that

22    there is something in his particular case that made the existing and generally available

23    administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1166.  Improper

24    screening of a prisoner's administrative grievances may excuse a failure to exhaust.  *See Sapp v.*

25    *Kimbrell*, 623 F.3d 813, 822-23 (9th Cir. 2010).  The prisoner must demonstrate "(1) that he

26    actually filed a grievance or grievances that, if pursued through all levels of administrative

27    appeals, would have sufficed to exhaust the claim that he seeks to pursue in federal court, and

28    (2) that prison officials screened his grievance or grievances for reasons inconsistent with or

23

1    unsupported by applicable regulations." *Id.* at 823-24.

2         As explained above, Defendants have presented evidence that Plaintiff's prison records

3    prove he did not submit grievances through CDCR's administrative grievance process concerning

4    the aforementioned ten allegations.  In response, Plaintiff has filed verified oppositions, as well as

5    various verified declarations in opposition to Defendants' motion, which are excessively lengthy

6    (with multiple attachments) but that seem to indicate he concedes that the four aforementioned

7    grievances are the ones relevant to the present case: CTF-HC-14040583; CTF-HC-1400415; CTF-

8    HC-14041350; and CTF S-14-01979.  *See* Dkt. 69 at 4.

9         As to the other ten claims in his complaint, it seems that Plaintiff generally argues that

10   Defendants "have com[m]itted perjury when stat[]ing that Plaintiff never exhaust[ed] his . . .

11   administrative remedies."  *Id.* at 2.  Such a conclusory argument is unavailing.  Although Plaintiff

12   is not required to allege that he resorted to extraordinary measures in order to exhaust his

13   administrative remedies, conclusory allegations that the administrative remedies process is

14   inadequate are insufficient to defeat dismissal for failure to exhaust.  *See White v. McGinnis*, 131

15   F.3d 593, 595 (6th Cir. 1997).  Plaintiff does allege that the administrative remedies were made

16   unavailable to him.  However, the court is not required to scour the record to determine whether

17   Plaintiff has made a particular argument that his administrative remedies were made unavailable to

18   him.  Thus, the aforementioned conclusory evidence presented by Plaintiff is insufficient to defeat

19   Defendants' motion for summary judgment as to the ten allegations in his complaint.

20   Furthermore, the fact that Plaintiff was able to file a total of seven health care appeals at CTF for

21   the period of September 9, 2013 through October 10, 2015, three of which he pursued to the

22   Director's level, suggests that he had adequate access to the administrative appeals process.  *See*

23   Robinson Decl. ¶ 8.  The evidence produced by Defendants *is sufficient* to carry their ultimate

24   burden of proof to show that the ten allegations relating to Plaintiff's medical claims are

25   unexhausted.

26        Accordingly, Defendants are entitled to summary judgment based on the failure to exhaust

27   administrative remedies as to the ten allegations, and their motion is GRANTED as to most of the

28   claims in Plaintiff's complaint, i.e., all claims except for the issues relating to: morphine, chronic

lower back pain, arthritis (CTF-HC-14040583); stronger medication for joint disease, arthritis, fractured wrist, shockwaves, neck pain, carpometacarpal (CTF-HC-1400415); and pain medications for degenerative disc disease, classification as "high risk," chronos for lower bunk/lower tier, back brace, and "unassigned" classification (CTF-HC-14041350) (which will be addressed below.)

### c. Deliberate Indifference to Medical Needs Claim

The court will now consider Defendants' alternative argument as to the remaining Eighth Amendment claims that: (1) the undisputed material facts based on the evidence shows they were not deliberately indifferent to Plaintiff's serious medical needs; and (2) they are entitled to qualified immunity. Dkt. 47 at 23-28.

As set forth above, deliberate indifference to serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment. *See Estelle*, 429 U.S. at 104. The analysis of a claim of "deliberate indifference" to serious medical needs involves an examination of two elements: (1) a prisoner's serious medical needs; and (2) a deliberately indifferent response by the defendants to those needs. *McGuckin*, 974 F.2d at 1059.

Defendants seem to concede that, as alleged, Plaintiff's health condition may rise to the level of a serious medical need. Instead, they argue Plaintiff cannot establish that any Defendant was deliberately indifferent to his serious medical needs because, "for those Defendants who treated and evaluated Plaintiff or reviewed his primary care physician [Defendant] Ahmed's recommendations, the evidence shows that their decisions were based on evaluations and diagnostic tests of Plaintiff's condition as well as applicable prison medical guidelines." Dkt. 47 at 24.

A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm. *McGuckin*, 974 F.2d at 1060. Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided

25

medical care. *See id.* at 1062.

Here, the court again reiterates that the remaining exhausted claims are Plaintiff's allegations relating to: a morphine request; chronic lower back pain; arthritis; stronger medication for joint disease, arthritis, fractured wrist, shockwaves, neck pain, carpometacarpal; pain medications for degenerative disc disease; classification as "high risk"; and chronos for lower bunk/lower tier, back brace, and "unassigned" classification.

In opposition to Defendants' motion for summary judgment, Plaintiff claims that Defendants violated his Eighth Amendment rights, stating:

> Plaintiff was treated with cruel and unusual punishment under the color of law combine[d] with negligence[], liability, pain and suffering, mental stress, mental emotions [and] that Plaintiff had filed 50 health care medical services slips to see that nurse or doctor due to his ongoing "bone" pain . . . and that the doctors at CTF Soledad failed to help as shock waves going down [his] body with hot spots over [his] lower body as well . . . .

Dkt. 69 at 5.

To the extent that Plaintiff's claim amounts to an allegation that Defendants were negligent in providing treatment—such an allegation does not support an Eighth Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain).

While Plaintiff's claims that he suffered "excruciating pain all day and night" (dkt. 6 at 8), and the doctors refused to help him, the medical records overwhelmingly show that although Plaintiff claimed to have extreme pain, there were no physical findings substantiating the existence of a medical condition that would result in extreme pain. Various x-rays taken during Plaintiff's incarceration at CTF revealed: mild-to-moderate degenerative changes in his vertebrae and discs; moderate degenerative joint diseases of the carpal (wrist) bones; and mild-to-moderate arthritis in

his knees, back, and neck, and bunions with arthritis. *See* Adams Decl. ¶ 13; Ahmed Decl. ¶ 9. The medical evidence supports that Plaintiff's pain was caused by degenerative disc disease and the aging process. *See* Bright Decl. ¶ 23. Defendant Bright further explains as follows:

> As people age, the water and protein content of the cartilage in the body changes, resulting in more fragile and thin cartilage. Both the discs and joints that stack the vertebrae are composed of cartilage and subject to "wear and tear" over time. Hence, degenerative disc disease is not truly a disease; it is a term used to describe the normal changes in an individual's spinal discs as the person ages.

*Id.* ¶ 20.

Despite Plaintiff's claims that he received inadequate or no treatment for his ailments, the medical records show that his conditions and complaints were treated continuously, based upon the medical evidence as well as the judgment of the medical providers (including his PCP, Defendant Ahmed), and the treatment was supported by diagnostic information, Plaintiff's functional status, and policies established by the California Prison Health Care Services and Title 15 of the California Code of Regulations. *See* Adams Decl. ¶ 13. Moreover, Plaintiff's claims that prior medications (morphine) controlled his symptoms do not mean they were the appropriate medication for his conditions. The record shows that Plaintiff was weaned off of his 15 mg. dose of extended release morphine in May 2014, when prison staff and Defendant Ahmed witnessed Plaintiff playing basketball. *Id.* at ¶ 13. A pain management review committee agreed with the recommendation to wean Plaintiff off morphine and give him alternative pain medications. Ahmed Decl. ¶ 16; Bright Decl. ¶ 19. According to the CCHCS' criteria for use of narcotics, there must be evidence of severe disease, which Plaintiff did not have at that time. Ahmed Decl. ¶ 18. Plaintiff's condition of degenerative disc disease was not severe enough to use narcotic medications such as morphine, and NSAIDs were appropriate under the circumstances. *Id.* at ¶ 19. According to Defendants, Plaintiff did not face a substantial risk of serious physical harm because his requests for morphine were denied. Adams Decl. ¶ 13. After repeated evaluations by his PCP, Plaintiff was provided continuously with alternative means for pain management, as medically indicated based on objective findings, Plaintiff's functional status, and the aforementioned policies. *Id.* Under Title 15 of the California Code of Regulations § 3354(a), only

qualified medical staff shall be permitted to diagnose illness and prescribe medication and medical treatment for inmates—it is not appropriate for Plaintiff to self-diagnose his own medical problems and then expect a medical practitioner to implement his own recommendation for the course of medical treatment. *See* Cal. Code Regs. tit. 15, § 3354(a). Thus, the undisputed medical evidence established a consensus between medical professionals that prescribing morphine was not appropriate for Plaintiff's conditions. Additionally, Plaintiff's treatment plan included alternative pain medications, and continuous offers of NSAIDs.

The record shows that Plaintiff had various medical conditions, and he was seen by medical staff at CTF over fifty times during his time at CTF. Ahmed Decl. ¶ 7. According to Defendant Ahmed, Plaintiff "never presented with any medical condition that could be considered either severe or life threatening." *Id.* at ¶ 30. Plaintiff also did not meet the criteria for gout. *Id.* ¶ 28. While Plaintiff claimed that his "left testis split in half," Defendant Ahmed indicates that Plaintiff "had a testicular cyst," for which Defendant Ahmed requested a urology consult, but it was denied. *Id.* at ¶ 27. Further, the record shows that Plaintiff's medical conditions did not justify an "unassigned" or "high risk" disability classification (based on his mild-to-moderate arthritis), or a need to receive special chronos for a lower bunk, extra pillow, extra mattress, specialty boots, or alternative pain medications. *See* Bright Decl. ¶¶ 17, 25.

In sum, the undisputed evidence supported by medical records shows no evidence to suggest that any of Plaintiff's medical conditions indicated a substantial risk of serious harm or that his requests for medical treatment were ignored. Even if Plaintiff claims he should have received different treatment for his medical needs, a difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60; *Sanchez*, 891 F.2d at 242. In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996) (citing *Farmer*, 511 U.S. at 837). The undisputed evidence establishes that Defendants chose a course of treatments that

28

was medically accepted. Although the medical treatment Plaintiff received may not have been what he considered proper treatment, he presents no evidence that Defendants were deliberately indifferent to his serious medical needs. Rather, the undisputed factual record shows that Defendant Ahmed provided appropriate treatment, repeatedly examined and evaluated Plaintiff, ordered multiple diagnostic tests, dealt with his requests for accommodations, and prescribed medications for pain related to Plaintiff's numerous complaints. *See* Ahmed Decl. ¶¶ 7, 20-22. Furthermore, the record shows that Defendants Adams and Bright justifiably denied accommodation requests that were found not to be medically necessary and did not meet the established criteria set forth in the IMSP&P for chronos. *See* Adams Decl. ¶¶ 8-9; Bright Decl. ¶¶ 11, 18.

Plaintiff's medical records lack information showing that any health care provider's decision between September 28, 2013 to October 10, 2015, denying Plaintiff's requests was medically unacceptable under the circumstances. *See* Bright Decl. ¶ 17; Adams Decl. ¶ 14. Consequently, Plaintiff cannot show that an individual Defendant knew Plaintiff had a serious medical condition or that any Defendant knowingly disregarded Plaintiff's medical needs and was the actual and proximate cause of harm to him. *See Leer v, Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Thus, Plaintiff has failed to provide evidence regarding an essential element of his claim.

Accordingly, Plaintiff's Eighth Amendment claims (as to the remaining exhausted allegations against Defendants Ahmed, Bright, and Adams) fail as a matter of law. Therefore, the court GRANTS Defendants' motion for summary judgment as to Plaintiff's claims that they were deliberately indifferent to his medical needs.[18]

### d. Failure to Link Defendants Chudy, Ellis, and Sepulveda

Further, Defendants argue that summary judgment must be granted as to Plaintiff's Eighth Amendment claim against Defendants Chudy, Ellis, and Sepulveda, because they were not involved in any health care decision, and Plaintiff fails to link them to his claim. Dkt. 47 at 26-27.

---

[18] The court's finding that Defendants are entitled to summary judgment as to Plaintiff's remaining Eighth Amendment claims obviates the need to address their alternative arguments that they are entitled to qualified immunity, and that these claims are barred as a result of a prior state court judgment entered in an action arising from the same incident in this federal action.

The court agrees.

Defendants Chudy and Sepulveda, who are both retired, had no involvement in Plaintiff's medical care or his administrative grievances. Chudy Decl. ¶ 3; Sepulveda Decl. ¶ 5. Defendant Ellis, as the CEO at CTF, only administratively reviewed Plaintiff's health care appeals and did not otherwise have any involvement in Plaintiff's healthcare decisions. Ellis Decl. ¶¶ 1-3.

The court finds that Plaintiff has failed to provide evidence that Defendants Chudy, Ellis, and Sepulveda knew that Plaintiff faced a substantial risk of serious harm and then disregarded that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. 825, 837 (1994). Further, Plaintiff has failed to demonstrate that, as a supervisor, Defendant Ellis should have known that his actions would have resulted in a constitutional injury. *See Starr*, 652 F.3d at 1208. As an administrator, Defendant Ellis "was not qualified to discern the nature of [Plaintiff's] medical needs," and was not involved personally in the medical care of Plaintiff. Ellis Decl. ¶¶ 1, 3, 6-8. The record shows that Defendant Ellis is responsible for "the delivery of health care services to inmate-patients at [CTF], and [he is] the designated hiring authority for health care services staff . . . ." *Id.* ¶ 2. While he reviews health care appeals, "the focus of his review is to ensure that staff has correctly implemented the regulatory standards and protocols." *Id.* at ¶ 2.

In sum, viewing the evidence in the light most favorable to Plaintiff, the undisputed evidence shows that there is no genuine issue of material fact as to whether Defendants Chudy, Ellis, or Sepulveda acted with deliberate indifference to Plaintiff's medical needs. *See Leslie*, 198 F.3d at 1158. Accordingly, these Defendants are entitled to judgment as a matter of law, and their motion for summary judgment is GRANTED.

## B. Plaintiff's Cross-Motion for Summary Judgment

Plaintiff has filed a cross-motion for summary judgment along with multiple declarations in support of his cross-motion. Dkts. 60-63, 69. Plaintiff's arguments consist mostly of his opposition to Defendants' motion for summary judgment. *See id.* Plaintiff claims in a conclusory fashion that "Defendants [have] failed to create any triable issue[] of fact[] in their motion for summary judgment and . . . on that basis Plaintiff [is] entitled to summary judgment due to Defendants['] and witness['s] perjur[ed] statements that were clearly shown to the court of

30

law . . . ." Dkt. 69 at 1-2. Plaintiff does not support his allegation that Defendants "committed perjury when stateing [sic] that Plaintiff never exhausted his . . . administrative remedies . . . ." *Id.* at 2. Instead, in one of his declarations, Plaintiff claims that he is "entitled to summary judgment because [he] *did* exhaust his appeal levels . . . ." Dkt. 60 at 9. However, such an argument is unavailing. As mentioned above, the PLRA requires a prisoner to exhaust "available administrative remedies" before *bringing* an action with respect to prison conditions. *See* 42 U.S.C. § 1997e(a). Thus, the exhaustion of administrative remedies allows inmates to bring section 1983 actions in federal court, but it does *not* automatically entitled them to summary judgment. As explained above, although the court has found that Plaintiff has indeed exhausted some of his medical claims, those claims do not survive summary judgment because Plaintiff did not identify material disputes of fact from which a reasonable juror could conclude that Defendants acted with deliberate indifference to Plaintiff's serious medical needs.

Furthermore, in his motion for summary judgment, Plaintiff simply re-alleges the same facts from his complaint in support of his Eighth Amendment claims of deliberate indifference to his serious medical needs. To the extent that Plaintiff claims that he is entitled to summary judgment as a matter of law, his motion must be denied. On Plaintiff's cross-motion, the evidence must be viewed in favor of Defendants, as the non-moving parties. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999); *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Because Plaintiff bears the burden of proof on all the issues at trial, on his cross-motion for summary judgment he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. *See Celotex*, 477 U.S. at 323. Because Defendants' motion for summary judgment has been granted above, Plaintiff's cross-motion must necessarily be denied.

Accordingly, Plaintiff's cross-motion for summary judgment is DENIED. Dkt. 69.

## IV. CONCLUSION

For the reasons outlined above, the court rules as follows:

1. Defendant Sepulveda's motion to join the other Defendants' motion for summary judgment is GRANTED, and the joinder is accepted. Dkt. 79.

2. Defendants' motion for summary judgment (dkt. 47.) is GRANTED on the basis

that:

a.      any such claim against Defendants Ahmed, Bright, Ellis, and Adams relating to the grievance process is DISMISSED with prejudice;

b.      Plaintiff failed to exhaust administrative remedies as to the following ten allegations: (1) denial of an extra pillow; (2) no pillow; (3) denial of an extra mattress; (4) denial of orthotic boots; (5) pain in his left knee; (6) pain in his left shoulder; (7) feet swelling; (8) "left testis split in half"; (9) dying, i.e., "life in danger"; or (10) stomach bleeding due to medication;[19]

c.      Plaintiff's Eighth Amendment claims (as to the remaining exhausted allegations against Defendants Ahmed, Bright, and Adams) fail as a matter of law; and

d.      the undisputed evidence shows that there is no genuine issue of material fact as to whether Defendants Chudy, Ellis, or Sepulveda acted with deliberate indifference to Plaintiff's medical needs.

3.      Plaintiff's cross-motion for summary judgment is DENIED.  *See* Dkts. 60-63, 69.

4.      Defendants' opposition to and implied motion to strike certain exhibits by Plaintiff (in support of his opposition and cross-motion) is DENIED as moot.  Dkt. 68 at 7-8.

5.      The Clerk of the Court shall terminate all pending motions and close the file.

6.      This Order terminates Docket Nos. 47, 60-63, 68, and 69.

IT IS SO ORDERED.

Dated:  September 19, 2017

_____
DONNA M. RYU
United States Magistrate Judge

---

[19] Plaintiff's complaint is DISMISSED without prejudice to refiling his Eighth Amendment claims for monetary damages relating to the aforementioned ten allegations after exhausting California's prison administrative process.  *See McKinney v. Carey*, 311 F.3d 1198, 1200-01 (9th Cir. 2002) (proper course in claims dismissed due to failure to exhaust administrative remedies is dismissal without prejudice to refiling).

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT PRESTON,

         Plaintiff,

      v.

ZAHED U. AHMED, et al.,

         Defendants.

Case No. 4:15-cv-04840-DMR

**CERTIFICATE OF SERVICE**

     I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

     That on September 19, 2017, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Robert  Preston ID: K87715
F3-A-23-1L
P.O. Box 5244
Corcoran, CA 93212-5244

Dated: September 19, 2017

Susan Y. Soong
Clerk, United States District Court

By:_____
Ivy Lerma Garcia, Deputy Clerk to the
Honorable DONNA M. RYU